1

2

3

4

5

6

7

8                    **IN THE UNITED STATES DISTRICT COURT**

9                   **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   SHERRY PRICE,                        No. CIV S-06-1939-CMK

12              Plaintiff,

13        vs.                             <u>MEMORANDUM OPINION AND ORDER</u>

14   COMMISSIONER OF SOCIAL
     SECURITY,
15
              Defendant.
16
     _____/
17

18              Plaintiff, who is proceeding with retained counsel, brings this action for judicial

19   review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g).

20   Pursuant to the consent of the parties, this case is before the undersigned for final decision on

21   plaintiff's motion for summary judgment (Doc. 17) and defendant's cross-motion for summary

22   judgment (Doc. 18).

23   / / /

24   / / /

25   / / /

26   / / /

# I.  PROCEDURAL HISTORY

Plaintiff applied for social security benefits on February 10, 2003.[1]  In her application, plaintiff claims that disability began on November 26, 2000.  Plaintiff claims her disability consists of a combination of "lower lumbar degenerative disc disease, . . . neck pops, wrist snaps, cracks, fingers are bad."   Plaintiff is a United States citizen born September 26, 1955, with a high school education and three years of college courses.  Plaintiff's claim was initially denied.  Following denial of her request for reconsideration, plaintiff requested an administrative hearing, which was held on February 28, 2004.  In his May 26, 2004, decision, Administrative Law Judge ("ALJ") John M. Bodley concluded that plaintiff was disabled and, therefore, entitled to benefits.

On its own motion, the Appeals Council remanded the case for further review.  In its September 20, 2004, order, the Appeals Council stated:

> The Administrative Law Judge found the claimant disabled . . . based upon finding that the claimant's degenerative disc disease reduced the claimant's ability to perform work.  The Administrative Law Judge found that the claimant could not perform prolonged or sustained sitting, standing, and walking, or lifting of more than 10 pounds.  The Administrative Law Judge further found that the claimant must be given the opportunity to take unscheduled breaks at will.  The Administrative Law Judge concluded that this assessment was supported by clinical findings and consistent with the evidence as a whole, as well as the opinion of the claimant's treating physician, Jeffrey Anderson, M.D. . . . .
>
> However, the restricted residual functional capacity found by the Administrative Law Judge is not supported by substantial evidence.  The Administrative Law Judge gave controlling weight to the opinion of the claimant's treating physician . . .; however, Dr. Anderson's medical assessment is not supported by objective evidence.  His treatment records show no evidence of neurological involvement.  Further, the Administrative Law Judge did not properly evaluate the opinion of the orthopedic consultative examiner, Dr. Charles R. Miller (Exhibit 6F).  The Administrative Law Judge stated that the claimant's musculoskeletal status and limited functional ability was clearly documented by this exam.  However, Dr. Miller indicated that the claimant has degenerative disc disease by MRI scan with no clinical evidence of radiculopathy.  He found no evidence of protrusion or stenosis on MRI scan of the lumbar spine

---

[1]     A protective application was apparently filed on November 20, 2002.

which was corroborated by his examination that day.  Dr. Miller concluded that based upon his physical examination, the claimant did not have any objective evidence of limitation or restriction of functional capacity.

The claimant's treating physician, Dr. Anderson, completed a residual functional assessment dated August 1, 2003, which limited the claimant to sitting 5 minutes at a time maximum, standing 7 minutes at a time with working 10 minutes maximum.  He restricted the claimant to no lifting or bending and stated that the claimant needed rest breaks every 15 minutes. Dr. Anderson listed the claimant's diagnosis as degenerative lumbar/lumbosacral disc with pain in her low back and in both legs (Exhibit 7F).  However, Dr. Anderson did not submit any clinical evidence to support this restrictive residual functional capacity.  Accordingly, the limitations found by Dr. Anderson were based upon the claimant's subjective complaints.

The Administrative Law Judge decision does not discuss credibility as required by Social Security Ruling 96-7p and it does not comply with Social Security Ruling 96-8p because there is no description of how the evidence supports each conclusion regarding the claimant's residual functional capacity citing specific medical facts and non-medical evidence.

On remand, the Appeals Council directed the ALJ to give further consideration to plaintiff's maximum residual functional capacity and provide appropriate rationale.  The ALJ was also directed to re-evaluate plaintiff's credibility regarding subjective complaints, obtain updated treating records, obtain an opinion from a medical expert in orthopedics, and consider the need for a vocational expert.

A second administrative hearing was held on October 13, 2005, before ALJ Mark C. Ramsey.  In his March 22, 2006, decision, the ALJ made the following findings:

1.   The claimant has not engaged in substantial gainful activity since the alleged onset of disability;

2.   The claimant's degenerative disc disease is a "severe" impairment, based upon the requirements in the Regulations. . .;

3.   This medically determinable impairment does not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4;

4.   The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision;

/ / /

/ / /

3

5.      The claimant has the residual functional capacity to lift/carry 20 pounds occasionally and 10 pounds frequently; stand/walk for six hours in an eight-hour day for one hour continuously; sit for six hours in an eight-hour day with customary breaks; and crouch, bend, and stoop occasionally; she can handle, manipulate, and use push/pull devices and foot controls;

6.      The claimant is unable to perform any of her past relevant work. . .;

7.      The claimant is an "individual closely approaching advanced age". . .;

8.      The claimant has a "high school education" and an Associates Degree. . .;

9.      The claimant has a semi-skilled past work background. . .;

10.     The claimant has the residual functional capacity to perform a significant range of light work. . .;

11.     Although the claimant's non-exertional limitations do not allow her to perform the full range of light work, using Medical-Vocational Rules 202.14 and 202.15 as a framework for decision-making and the testimony of the vocational expert, there are a significant number of jobs in the national economy that she could perform; examples of such jobs include work as a ticket taker, a parking lot attendant, and a cashier; and

12.     The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision. . . .

Based on these findings, the ALJ concluded that plaintiff was not entitled to benefits.  After the Appeals Council declined further review on January 30, 2006, this appeal followed.


## II.  SUMMARY OF THE EVIDENCE

**A.**     **Medical Records**

The certified administrative record ("CAR") contains the following medical records:

1.      March 1989 and February 2000 – Watsonville Community Hospital emergency room records (CAR 142-50);

2.      December 2000 – San Jose Medical Center emergency room records (CAR 153-55);

3.      November 2000 through June 2001 – Medical records from Eric R. Carlblom, M.D. (CAR 216-34);

4.      March 2002 – San Jose Medical Center emergency room records (CAR 158-62);

5.      March 2002 through July 2002 – Medical records from Arthur W. Anderson M.D. (CAR 235-39);

6.      April 5, 2002 – Medical report by Charles Griffin, M.D., of a lumbar spine MRI (CAR 163-64);

7.      January 15, 2003 – Report from Steven D. Feinberg, M.D. (CAR 202-13);

8.      March 13, 2003 – Supplemental report from Steven D. Feinberg, M.D., following receipt of April 5, 2002, MRI results (CAR 198-201);

9.      March 28, 2003 – Progress notes from Arthur W. Anderson, M.D. (CAR 166-67);

10.     April 15, 2003 – Report following an orthopedic consultative examination by agency doctor Charles R. Miller, M.D. (CAR 168-76);

11.     July 2003 through October 2005 – Medical records from Jeffrey A. Anderson, M.D. (CAR 243-54);

12.     August 1, 2003 – Disability evaluation from Jeffrey J. Anderson, M.D. (CAR 177-82);

13.     July 29, 2004 – Letter from Jeffrey J. Anderson, M.D. (CAR 214-15);

14.     November 17, 2004 – Medical report by Jon A. Hohmeister, M.D., of a lumbar spine MRI (CAR 184);

15.     April 26, 2005 – Report following a neurological consultative examination by agency doctor Rebecca Jordan, M.D. (CAR 186-97);

16.     June 29, 2005 – Report following examination by pain management specialist Al Cheung, M.D. (CAR 240-42);

17.     March 17, 2006 – Supplemental report from Steven D. Feinberg, M.D. (CAR 270-79); and

18.     April 2006 – Letter and residual functional capacity assessment from Jeffrey J. Anderson, M.D. (CAR 258-69).

1989 – Plaintiff was seen at the Watsonville Community Hospital emergency room in March 1989.  The records from this visit are largely illegible, but it appears that plaintiff presented with some kind of bladder or genital problem.

/ / /

1        2000 – The next record is from February 2000, when plaintiff was again seen at

2    the Watsonville Community Hospital emergency room.  Plaintiff complained of back pain for

3    three weeks.  The records from this visit indicate that plaintiff "fell 3 weeks ago injuring her

4    back, pain increasing esp. over past few days."  No specific back problem was observed.

5    Plaintiff was prescribed Vicodin and advised to use a cold compress.[2]

6        In November 2000, plaintiff suffered a work injury when she fell while working

7    as a waitress.  The record indicates that she went to the emergency room at San Jose Medical

8    Center on the day of her accident – November 26, 2000.  On December 1, 2000, plaintiff

9    returned to the San Jose Medical Center emergency room for a check on her right little finger.

10       She initially saw Dr. Carlblom following her accident.  In his report of

11   occupational injury, Dr. Carlblom reported that plaintiff's subjective complaints included "pain

12   in cervical region, lumbar/pelvis and right wrist/hand."  He diagnosed wrist sprain, contusions,

13   cervical strain, and instability.  He prescribed pain medication and recommended physical

14   therapy.  He concluded that plaintiff was not able to return to work.  Plaintiff did not attend her

15   December appointment with Dr. Carlblom.

16       2001 – Plaintiff next saw Dr. Carlblom in January 2001.  At that time, plaintiff

17   reported "mild improvement overall. . . ."  Dr. Carlblom instructed plaintiff to attend physical

18   therapy for her hand three times per week and estimated completion of that process in four

19   weeks.  He also directed her to remain off work.

20   / / /

21

22       [2]    Records from Dr. Feinberg (discussed below) indicate that plaintiff was seen by
     James Dailey, D.O., from March 13, 2000, through May 10, 2000, as a result of this injury.

23   Those records, however, are not part of the certified administrative record before this court.
         According to Dr. Feinberg, plaintiff complained to Dr. Dailey of lower and upper

24   back pain radiating into her upper shoulder.  Dr. Dailey diagnosed lumbar, thoracic, and cervical
     strain/sprain and recommended kinetic therapy.  Dr. Dailey last saw plaintiff in May 2000, at

25   which time she reported still being symptomatic.  Plaintiff, however, did not return for any
     further treatment with Dr. Dailey and reported to Dr. Feinberg in January 2003 that she had

26   "cleared completely."

1     In February, Dr. Carlblom prepared a progress report for the worker's

2 compensation insurance company.  He noted that plaintiff's subjective complaints were limited

3 to her right hand.  Objectively, Dr. Carlblom noted:

4         Active range of motion:  stiffness in the small finger is now resolved.
        Thumb opposition is now full.  Wrist flexion and extension are self-
5         limited due to pain.  Edema is negligible.  Strength: this is the first time
        that strength has been able to be measured due to pain symptoms.  Right
6         grip =13 pounds, norm = 86.9 pounds; left grip = 41.7 pounds, norm = 78
        pounds.  Pinches are grossly below normal limits for age and gender
7         bilaterally, although right is much weaker than the left.  Sensation:  patient
        continues to report tingling in the ulnar side of the hand, no change from
8         previous reports.

9 Dr. Carlblom indicated that unsuccessful attempts had been made to "wean [plaintiff] from the

10 splint" on her right hand.

11     A March 2, 2001, progress report from the physical therapist indicates that

12 plaintiff's grip strength in the right hand was reduced from 13 pounds to only 5.3 pounds and that

13 pinches remained "grossly unchanged."  The therapist also noted:  "Patient states all resistive

14 activities are painful – but declines modalities at end of session which could assist in pain

15 reduction."  Plaintiff returned to Dr. Carlblom on March 14, 2001.  Dr. Carlblom noted mild

16 improvement, but slower than expected and not significant.  He recommended continued

17 physical therapy.

18     By the beginning of April 2001, plaintiff had been discharged from hand physical

19 therapy. The therapist noted that plaintiff was consistently late to her sessions and then curtailed

20 them in order to attend aquatic therapy sessions.  At the end of April, Dr. Carlblom noted slow

21 improvement.

22     In June 2001, Dr. Carlblom noted on a progress report that continued physical

23 therapy had been denied by the insurance carrier.  He also reported that, subjectively, plaintiff's

24 complaints of pain had increased and that her condition had worsened.  There do not appear to be

25 any objective findings accompanying this report.

26     There are no medical records for the remainder of 2001.

2002 – On March 2, 2002, plaintiff reported to the San Jose Medical Center emergency room complaining of a rash to her upper chest, arms, and upper back area, as well as her face and around her ears. Plaintiff was prescribed Benadryl and started on Prednisone. The records indicate that the rash was most likely some kind of allergic reaction.

The record contains notes from Dr. Arthur Anderson dated March 22, 2002. Dr. Anderson noted that plaintiff "continues to have severe discomfort in her low back with popping with breathing and other motions." He noted the following on physical examination:

> On examination, the patient is a moderately obese female who walks with a limp favoring her right leg. She has about a fifty percent limitation of motion in her neck without discomfort. She has full range of shoulder motion without discomfort or pulse obliteration. She has full pronation and supination of her wrist but dorsiflexion is limited about twenty degrees and volar flexion about thirty degrees on the right. Her finger motion seems to be full, although maybe just a little tight for the fifth finger in touching the distal palmar crease. Neurologically she has no deficit in her lower extremities. Her straight-leg raising is positive at ninety degrees bilaterally.

Dr. Anderson noted that surgery was of limited appeal and concluded that he could not recommend a treatment plan without an MRI.

On April 5, 2002, Dr. Griffin reported on the results of a lumbar spine MRI study. His impressions were: (1) mild diffuse degenerative change throughout the lumbar spine, most prominent at L4-5 and L5-S1; (2) no lateral disc protrusion or high grade spinal stenosis; and (3) mild left sided bony foraminal stenosis at L5-S1 which appears to be degenerative.

Plaintiff returned to Dr. Arthur Anderson on April 16, 2002. He noted that plaintiff's "pain persists" and, based on the MRI results, diagnosed "degen. lumb/lumbosacral disc."

On July 2, 2002, Dr. Anderson submitted a document to the California Worker's Compensation Appeals Board indicating his opinion that plaintiff remained totally temporarily disabled as a result of her work accident in November 2000.

There are no other medical records for 2002.

2003 – In January 2003, plaintiff was examined by Dr. Feinberg in connection with plaintiff's worker's compensation case.  Dr. Feinberg noted the following on physical examination:

> On physical examination she is a pleasant and cooperative, somewhat disheveled appearing, overweight female who was 5'5" in height and who weighs 212 pounds.  She walks with a limping gait and initially held onto the walls as she came into my office.
>
> She has full cervical, shoulder, and upper extremity range of motion but complains of wrist discomfort at the extreme of range and in fact, her right wrist is tender to palpation as well.  She self-limits lumbar flexibility to 75% of expected with discomfort at the ends of range.  Hip and lower body range were otherwise normal.
>
> There was no muscular atrophy with the arms equal at 12-1/2", the forearms equal at 10-1/2", the right thigh at 15-3/4" and the left was 14-1/2".  She has palpatory discomfort nonspecifically about the upper back and neck as well as the low back area.
>
> Grip strength was measured using a Jamar dynamometer in pounds with the following values obtained:  Right 39/50/54 and left 61/74/59.  Manual muscle testing was otherwise normal and she was able to walk on her heels and toes and to a partial squat.  Sensation appeared intact throughout.  Straight leg raising was negative.  Gait was antalgic.  Reflexes were physiologic and +2 at the biceps, triceps, knees, and ankles and the plantar responses were flexor.  Ulnar Tinel's was negative at both elbows.  Median Tinel's and Phalen's testing were negative bilaterally.

Dr. Feinberg diagnosed:  (1) lumbar spondylosis; (2) chronic cervical strain; and (3) chronic right wrist tendinitis.  Dr. Feinberg's final impressions were:

> In summary, Ms. Sherry Price . . . has been highly symptomatic ever since [the November 26, 2000 accident] and for reasons that are unclear to me has been kept in a temporary disability status over a prolonged period.  She does have residual right wrist discomfort and mildly reduced grip strength on that side but her examination is otherwise neurologically intact.  She has known lumbar spondylosis.

He opined that plaintiff could go back to work with unrestricted duties.  He did state that she would be precluded from "very heavy work" and was limited with respect to right wrist gripping, pulling, grasping, and manipulation.  Overall, Dr. Feinberg thought that plaintiff was "clearly magnifying her symptoms" and has "become very somatically preoccupied."  In a March 13,

1    2003, supplemental report following his review of MRI test results, Dr. Feinberg concluded that

2    his previous opinion remained unchanged.

3            Plaintiff saw Dr. Arthur Anderson again on March 29, 2003.  Subjectively, he

4    noted plaintiff complained of persistent back pain and pain into both legs.  Objectively, he

5    concluded that plaintiff was neurologically intact.  While his diagnosis remained the same as last

6    time, he now concluded that plaintiff could return to modified work "as per . . . report,"

7    apparently referring to Dr. Feinberg's report.

8            On April 15, 2003, Dr. Miller reported on a complete orthopedic evaluation of

9    plaintiff.  As to every objective test, plaintiff's responses were within normal limits.  Dr. Miller's

10   impression was:

11           The patient has degenerative disc disease by MRI scan with no clinical
             evidence of radiculopathy.  Lumbar spine shows chronic pain syndrome.
12           The right hip shows no objective evidence of radiculopathy or joint
             abnormality.  Post mild fracture of the right wrist not requiring surgery
13           with full function of the wrist and hand.  No evidence of protrusion of
             stenosis on MRI scan of the lumbar spine, corroborated by today's
14           physical examination.

15   Dr. Miller concluded that "the patient has no objective evidence of limitation or restriction of

16   functional capacity."

17           Dr. Jeffrey Anderson examined plaintiff on August 1, 2003.  Subjectively, he

18   noted that plaintiff complained of "pain in low back aggravated by sitting, standing, walking,

19   bending, and lifting."  Plaintiff stated that she could only sit or stand for five to ten minutes at a

20   time.  Objectively, Dr. Anderson observed that plaintiff was neurologically intact.  While he lists

21   other impressions under the heading for "Objective Findings," these are based entirely on

22   plaintiff's complaints of pain and tenderness.  Dr. Anderson recommended continuation of pain

23   medications, exercise, and swimming.  In a drastic departure from Dr. Arthur Anderson's opinion

24   from March 2003, Dr. Jeffrey Anderson concluded that plaintiff should remain off work

25   permanently.

26   ///

Dr. Jeffrey Anderson examined plaintiff again on October 1, 2003.  Plaintiff's subjective complaints were unchanged.  While just two months earlier Dr. Anderson opined that plaintiff was permanently disabled, this time Dr. Anderson concluded that plaintiff should remain off work until re-trained, but that she could return to modified work with "[n]o lifting over 15 lbs., no repetitive bending, and she should be able to alternate between sitting and standing every twenty minutes."

2004 – The record does not contain any medical evidence from October 2003 through June 2004.

On July 27, 2004, Dr. Jeffrey Anderson examined plaintiff.  He observed that her neurologic exam was intact and that her hip and knee range of motion were full and not accompanied by complaints of pain.  He also reported negative straight leg raising, 90 degrees bilaterally.  On July 29, 2004, Dr. Jeffrey Anderson wrote a letter to the Social Security Administration purporting to provide "specific clinical information about the nature of [plaintiff's] back disability."  He reported that the April 5, 2002, MRI showed "diffuse degenerative changes throughout the lumbar spine, most focally prominent at L4/5 and L5-S1." He did not cite any other objective findings but noted that plaintiff cannot stand or sit for more than five or ten minutes at a time.  He concluded that plaintiff could not work at all.

Dr. Anderson saw plaintiff again on November 12, 2004.  He reported that plaintiff complained of more severe pain, although she could not explain why she was in more pain.  Objectively, straight leg raising was negative and neurologically plaintiff was intact.  He concluded that plaintiff remained permanently disabled.

Another MRI was conducted on November 17, 2004, by Dr. Hohmeister.  His impressions were:  (1) mild facet hypertrophy at L4-5 bilaterally with slight abnormality of L4 on L5; and (2) disc degeneration at L5-S1 with loss of height, mild posterior annular bulge and ridging, minimal left facet hypertrophy, and mild left foraminal narrowing.

/ / /

1         2005 – Plaintiff returned to Dr. Jeffrey Anderson on March 4, 2005.  The

2    subjective complaints were the same.  This time, however, he reported that straight leg raising

3    caused back pain.  Neurologically, plaintiff remained intact.  Dr. Anderson opined that plaintiff

4    should remain off work until re-trained.  There is no indication in this report that plaintiff was

5    permanently disabled.  Dr. Anderson noted that plaintiff was planning on opening up a home

6    business.

7         On March 30, 2004, Dr. Anderson reported that plaintiff's back pain had

8    improved with an injection he had given her.  Plaintiff stated that she wanted to continue with

9    trigger point injections.

10        On April 26, 2005, Dr. Jordan reported on her neurological examination of

11   plaintiff at the request of the agency.  Based on the results of a battery of tests, Dr. Jordan

12   provided the following functional capacity assessment:

13        The claimant is limited by back pain with disc disease and findings as
     described above.  Bending, stooping, and crouching are limited to

14        occasional.  She can walk without any assistive device.  Standing and
     walking is estimated at 1 hour continuously and 6 hours total in view of

15        somewhat antalgic gait.  Sitting is 6 hours with customary breaks.  She can
     handle, manipulate, and use push/pull devices and foot controls.  Lifting

16        and carrying is limited to 10 pounds frequently and 20 pounds
     occasionally in view of back pain with degenerative disc disease with

17        findings including positive straight leg raising and somewhat antalgic gait
     as described above.  Examination reveals no objective findings of other

18        significant physical limitation.

19        Plaintiff was seen on June 29, 2005, by Dr. Cheung, a pain management

20   specialist.  Dr. Cheung reported plaintiff's description of her pain as follows:

21        The patient completed a pain questionnaire in the office prior to the
     evaluation.  On the pain drawing she noted it is most painful at the midline

22        area in the lumbosacral junction in the lower back region.  She also
     marked the areas of increasing pain and discomfort in the bilateral

23        buttocks and bilateral groin and thighs.  She rated her pain as constant at 6
     or 7 on a scale of 1 to 10.  She described the pain as sharp, aching,

24        throbbing, and shooting in nature.  It seems to travel to both sides of her
     thighs, more significantly to the right than to the left.  The pain feels tight

25        at times.  It is worse with prolonged standing and walking.  Sometimes
     prolonged sitting also bothers her.  Swimming relieves her pain. . . .   In

26        the last few years she reports that the pain has been increasing.

1   On physical examination, Dr. Cheung reported:

2        . . .On examination of the low back, the patient walked with slight limping
         on the right leg.  She is able to flex to 90 degrees without significant pain
3        in her lower back region.  There is mild to moderate tenderness to
         palpation in the SI joint region bilaterally.  No muscle spasm is noted.
4        Deep tendon reflexes at the knees and ankles were symmetrical.  Motor
         and sensory examinations were grossly normal.  Straight leg raise
5        examination revealed pain in her lower back region.

6   Dr. Cheung concluded that plaintiff has "significant symptoms related to her work injury" and

7   felt that she would be a good candidate for steroid injection therapy.  He also noted that plaintiff

8   seemed "on the verge of decompensation when she discusses [her pain]" and he started her on

9   Zoloft because he felt her pain "has given her more symptoms of depression. . . ."

10        Plaintiff went back to Dr. Jeffrey Anderson on July 14, 2005.  His examination

11  findings and treatment plan were the same as the previous visit.  Despite the lack of significant

12  objective findings, Dr. Anderson opined that plaintiff could not lift more than five to ten pounds

13  and can only rarely bend.  He also stated that plaintiff was limited to standing, sitting, and

14  walking for only ten minutes at a time.  He did not indicate that plaintiff was permanent and

15  stationary.

16        Dr. Anderson examined plaintiff again on October 4, 2005.  This time, however,

17  he opined that plaintiff was permanent and stationary, even though his objective findings were

18  essentially the same.

19        2006 – Dr. Feinberg conducted another examination of plaintiff on March 17,

20  2006, in connection with her worker's compensation case.  As to objective findings, Dr. Feinberg

21  reported:  (1) plaintiff self-limits lumbar flexibility to 75%; (2) manual muscle testing was

22  normal; (3) straight leg raising was negative; (4) sensation was intact; and (5) reflexes were

23  normal.  He opined that steroid injections were of questionable value in a patient like plaintiff

24  with chronic pain symptoms.  He did not think her condition was objectively different than the

25  last time he evaluated her.

26  / / /

1    In April 2006, Dr. Anderson prepared a residual functional capacity assessment in

2    which he opined that plaintiff could occasionally lift up to ten pounds and frequently lift under

3    ten pounds.  He stated plaintiff could stand and/or walk with normal breaks for at least two hours

4    in an eight-hour day, but that she could sit for less than six hours in an eight-hour day, with

5    periodic alternating between sitting and standing.  However, he added on the form that plaintiff

6    "can only sit or stand 10-15' at a time" and "must alternate frequently" and "must lie down 15-20'

7    for 4-6x daily."  He also assessed significant postural limitations.  Despite plaintiff's complaints

8    of wrist problems, he did not note any manipulative limitations.

9    **B.    Hearing Testimony**

10    Plaintiff testified at administrative hearings held on February 28, 2004, at which

11    time she was represented by Jack Matlock, and October 13, 2005, at which time she was

12    represented by Steve Skinner.

13    1.    February 2004 Hearing

14    Plaintiff stated she had a work injury on November 26, 2000, and that she hasn't

15    worked since that date due to "[a] lot of pain."  At the time of her work injury, plaintiff was

16    working as a waitress.  She described her accident as follows:

17    . . . I was in the back room and I was walking the back of the prep
room. . . .  And I had two cups in my right hand and a tray in my left hand.

18    And as I was turning the corner to the right, there was a mat that was
missing on the L turn of the corner.  And there was a thin amount of water

19    there – but it was dirty, mucky, sticky water because as I fell in it, my right
foot went out from under me and I just about hit the dishwasher.  And so I

20    was – I got my back jerked in and out – popped in and out to stop.  And
then I fell over to the side on the cement where there was no mat and the

21    cups broke, my wrist broke and my two fingers on the right hand – on my
right hand.  As I was laying there on the floor, two busboys came and

22    helped pick me up, put me – turned me around and put me over to the
counter.  And I scooched . . . my way back to where my purse was, and

23    everyone that saw me – my employer came over and – not my employer.
The lady that was on as a head waitress came out and said, oh, my gosh,

24    are you okay.  And I said, I don't think so; I can't walk.  So they helped me
outside the front door.  I hobbled my way to the car, got in the car and

25    went to the emergency room.

26    / / /

14

Plaintiff stated that, right after her accident, she first saw Dr. Carlblom and did not begin seeing Dr. Arthur Anderson until about a year after the accident.  She was seeing Dr. Jeffrey Anderson at the time of the hearing.[3]   According to plaintiff, Dr. Jeffrey Anderson told plaintiff the following about her condition:

> He told me that all five disks are involved in my back, that he didn't believe that it would get any better.  He believes that my prognosis was fair to poor and that there was quite a bit of injury in the L2 and L3 disks, crushed disks.  He said the back was the least known of all the parts of the body that he is going to be studying – or that doctors have studies and that is least known; that my prognosis would not be very well if I was paralyzed, which there was a great chance that I could become paralyzed. And that was a major issue with so many other vertebras involved in this injury.

Plaintiff testified that, while Dr. Carlblom suggested surgery, neither of the Andersons did.

As to limitations, plaintiff testified that, as of the time of the hearing, her wrist was still giving her problems.  Specifically she said that she cannot pick up half-gallon cartons of milk or heavy pans of water.  She stated her wrist pain also causes problems with writing because her "hand cramps up" after about 20 minutes.  She also stated that she cannot do "heavy lifting" or sit, stand, or walk for more than "five to ten minutes" before experiencing terrible pain "like someone is squeezing and pinching my back constantly."  She stated that, if she sits too long, her legs "get numb and tingly" and  her "back tightens up."  She testified that a hot bath sometimes provides relief, but that she needs help getting in and out of the bathtub.

As to daily activities, plaintiff testified that she reads, crochets, and sews.  She also does dishes, but does not vacuum or mop.   She stated that she can no longer do active things like play soccer or tennis or go horseback riding.  She testified that, because of pain, she is not as outgoing as she used to be.  Plaintiff testified that she drove herself to the hearing.

/ / /

/ / /

---

[3]     She clarified that Arthur Anderson is Jeffrey Anderson's father.  She first saw Arthur Anderson and, after he retired and gave his practice to his son, she saw Jeffrey Anderson.

1   Plaintiff did not think that she could do a job which didn't require lifting and

2   where she would be allowed to sit and stand whenever she needed to.  She stated that, while she

3   might be well for one or two days, she's "down for a week" because of pain.  Plaintiff testified

4   that, since her work accident, she has not tried to return to work.

5          2.   October 2005 Hearing

6   Plaintiff testified that she still has pain and numbness in her right hand that

7   prevents her from using it.  She stated that she did not think she could do repetitive filing work.

8   She also stated that she has continuous pain in her back, and that the pain is worse when it is cold

9   outside.  According to plaintiff, her back pain became worse over time.

10   As to daily activities, plaintiff testified that her son does most of her chores for

11   her, although she stated she did laundry every three days.  She also stated that she prunes plants

12   in her garden.  For exercise, she "moves in the house," walks and plays with her dog.  She walks

13   for ten to 15 minutes at a time on days she feel well enough.

14   At this hearing following the Appeals Council's remand, there was a discussion

15   between the ALJ and plaintiff's representative regarding the lack of objective clinical findings to

16   support Dr. Jeffrey Anderson's conclusions.  Specifically, the following exchange occurred:

17          ALJ:   Well, let me cut to the chase.

18          REP:   Okay.

19          ALJ:   There's no medical records from the doctor supporting his
       medical assessment.  Why don't you have any – why don't you – why
20          haven't you provided his medical record for me?  That's the main [reason
       for] the remand.  They said there was no medical evidence to support the
21          doctor's assessment.

22          REP:   At this point I contacted Dr. Jeff Anderson on Thursday,
       which was when I was – agreed to take this case.
23
       ALJ:   So you just got the case?
24
       REP:   Yes, sir.
25
       ALJ:   Okay.
26

1          REP:   And he's out of the country until the 1st of November.  But
   he did call and leave a message on my answering machine saying that he
2  would appear at a hearing or complete the forms or –

3          ALJ:   Well, he's completed all the forms we want.  That's the
   problem with the case.  That's why they remanded it.  He checked blocks
4  on a form and there was no medical evidence.  You have some MRIs
   showing mild problems.  We don't have any clinical evidence.  We don't
5  have his medical records, tests or – you've referred to other medical
   records.  I don't have those records either.

6
7          REP:   I am – also read the letters that he submitted in
   [INAUDIBLE] nature.  They're not specific enough –

8          ALJ:   Well, it's fine he has the letter, but we needed his medical
   records.

9

10  Plaintiff's representative said he would provide Dr. Anderson's records after the hearing.

11

12                        **III.  STANDARD OF REVIEW**

13          The court reviews the Commissioner's final decision to determine whether it is:

14  (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a

15  whole.  See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is

16  more than a mere scintilla, but less than a preponderance.  See Saelee v. Chater, 94 F.3d 520, 521

17  (9th Cir. 1996).  It is ". . . such evidence as a reasonable mind might accept as adequate to

18  support a conclusion."  Richardson v. Perales, 402 U.S. 389, 402 (1971).  The record as a whole,

19  including both the evidence that supports and detracts from the Commissioner's conclusion, must

20  be considered and weighed.  See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones

21  v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  The court may not affirm the Commissioner's

22  decision simply by isolating a specific quantum of supporting evidence.  See Hammock v.

23  Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the administrative

24  findings, or if there is conflicting evidence supporting a particular finding, the finding of the

25  Commissioner is conclusive.  See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987).

26  Therefore, where the evidence is susceptible to more than one rational interpretation, one of

                                           17

which supports the Commissioner's decision, the decision must be affirmed, see Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988).

## IV.  DISCUSSION

In her motion for summary judgment, plaintiff raises four arguments:  (1) the ALJ erred in his severity determination by concluding that plaintiff's only severe impairment was degenerative disc disease; (2) the ALJ improperly rejected the opinion of her treating physician, Dr. Jeffrey Anderson; (3) the ALJ improperly rejected her testimony as not credible; and (4) the ALJ based his decision on the vocational expert's answers to a hypothetical question which did not reflect all of her limitations.

### A.    Severity Determination

In order to be entitled to benefits, the plaintiff must have an impairment severe enough to significantly limit the physical or mental ability to do basic work activities.  See 20 C.F.R. §§ 404.1520(c), 416.920(c).[4]  In determining whether a claimant's alleged impairment is sufficiently severe to limit the ability to work, the Commissioner must consider the combined effect of all impairments on the ability to function, without regard to whether each impairment alone would be sufficiently severe.  See Smolen v. Chater, 80 F.3d 1273, 1289-90 (9th Cir. 1996); see also 42 U.S.C. § 423(d)(2)(B); 20 C.F.R. §§ 404.1523 and 416.923.  An impairment, or combination of impairments, can only be found to be non-severe if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work.  See

---

[4]    Basic work activities include: (1) walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.  See 20 C.F.R. §§ 404.1521, 416.921.

1 Social Security Ruling ("SSR") 85-28; see also Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir.

2 1988) (adopting SSR 85-28). The plaintiff has the burden of establishing the severity of the

3 impairment by providing medical evidence consisting of signs, symptoms, and laboratory

4 findings. See 20 C.F.R. §§ 404.1508, 416.908. The plaintiff's own statement of symptoms alone

5 is insufficient. See id.

6 　　　　Plaintiff argues that the ALJ erred in concluding her only severe impairment was

7 degenerative disc disease. She contends that the "ALJ completely discounted Ms. Price's

8 chronic pain syndrome, obesity, depression, and right wrist sprain/instability as severe

9 impairments at step two."

10 　　　　1.　　Chronic Pain Syndrome and Depression

11 　　　　Plaintiff argues that the ALJ failed to include her "separate diagnosis of chronic

12 pain syndrome as a severe impairment at step two." She also states that "pain and depression

13 frequently go hand-in-hand." Citing an internet site containing medical definitions, plaintiff

14 states that chronic pain syndrome consists of "anxiety, depression, anger, and changed lifestyle,

15 all with a variable but significant level of genuine neurologically based pain."[5] With respect to

16 depression in particular, plaintiff refers to records from Dr. Cheung, a pain management

17 specialist, who saw plaintiff in June 2005. As to depression and pain, the ALJ stated

18 　　　　　Dr. Cheung initiated antidepressants and recommended a series of three
　　　　　lumbar epidural steroid injections to more effectively treat the claimant's
19 　　　　　chronic pain (Ex. 16F). The record does not support any further clinical
　　　　　findings of depression by mental health practitioners. The claimant did
20 　　　　　not seek treatment or enroll in counseling sessions to address depression.
　　　　　As Dr. Cheung is not a specialist in the field of mental health, his opinion
21 　　　　　is assigned little weight. The undersigned finds that these impairments do
　　　　　not significantly limit the claimant's mental ability to perform basic work
22 　　　　　activities. The claimant's depression is, therefore, not severe within the
　　　　　meaning of the Regulations.
23

24 ――――――――――――

25 　　　　　[5]　　　The factual basis of plaintiff's argument is belied by the objective findings of even
her treating physician, Dr. Jeffrey Anderson, who consistently reported that plaintiff was
neurologically intact. Thus, there is no neurologically based pain to support chronic pain
26 syndrome.

\* \* \*

The substantial evidence of record, as noted above, confirms that the
claimant continues to have problems with the pain associated with
degenerative disc disease.  The evidence supports the findings regarding
the claimant's ability to perform work-related activities.  Even with the
limitations that the claimant's conditions impose, the record supports that
the claimant still retains the ability to lift and carry 20 pounds occasionally
and 10 pounds frequently; stand and walk for six of eight hours for one
hour continuously; sit for six of eight hour with customary breaks; and
occasionally crouch, bend, and stoop.  She can handle, manipulate, and use
push/pull devices and foot controls.

Plaintiff argues this discussion is not based on the proper legal standard.

Specifically, she contends that the ALJ may not dismiss a diagnosis of depression merely because

there is no evidence from a mental health specialist.  She cites Sprague v. Bowen for the

proposition that any physician can diagnose depression.  See 812 F.2d 1226, 1232 (9th Cir.

1987).  She also cites Nguyen v. Chater in arguing that the ALJ may not use a "lack of treatment"

rationale to reject mental complaints.  See 100 F.3d 1462, 1465 (9th Cir. 1996).  As to chronic

pain, plaintiff argues:  "Nor did the ALJ include Ms. Price's separate diagnosis of chronic pain

syndrome as a severe impairment at step two."  Other than records from Dr. Cheung, plaintiff

does not reference any medical records in support of her arguments concerning depression and

chronic pain syndrome.  Defendant does not provide any meaningful argument in opposition.[6]

/ / /

/ / /

/ / /

---

[6]    Defendant argues:

. . . Where there was no suggestion of chronic depression and no
additional treatment, the ALJ reasonably found no severe impairment or
depression (AR 18).  Moreover, as to Plaintiff's alleged chronic pain
syndrome, the ALJ permissible discounted Plaintiff's credibility . . . .

Defendant does not cite any authority or evidence in support of these conclusory statements.  Nor
does defendant address plaintiff's arguments based on Sprague and Nguyen.

In Sprague, the Ninth Circuit addressed the ALJ's consideration of the claimant's mental state and concluded:

> We believe there was both psychiatric and other qualified evidence of Mrs. Sprague's mental state. The evidence introduced included her treating physician's opinion of her mental state as well as Mrs. Sprague's testimony and that of her friend and her daughter. This medical opinion and lay testimony constitutes qualified evidence which the ALJ must address on remand.

Sprague, 812 F.2d at 1231-32.

The court specifically held that there is no requirement that evidence of a claimant's mental state must be offered by a psychiatrist. See id. at 1232. As to the claimant's treating physician, whose opinion the court concluded was sufficient evidence of the claimant's mental state, the court observed that he had been the claimant's doctor for 25 years. See id. at 1228. The court also observed that the claimant's treating physician had made a medically-acceptable clinical diagnosis of depression which was based on objective findings. See id. at 1232.

In Nguyen, the Ninth Circuit once again considered the claimant's depression and stated:

> . . . [I]t is common knowledge that depression is one of the most underreported illnesses in the country because those afflicted often do not recognize that their condition reflects a potentially serious mental illness. (citation omitted). Thus, the fact that claimant may be one of millions of people who did not seek treatment for a mental disorder until late in the day is not a substantial basis on which to conclude that [a doctor's] assessment of claimant's condition is inaccurate.

Nguyen, 100 F.3d at 1465.

In that case, the claimant had, in fact, sought treatment specifically for depression, albeit "late in the day," as the court observed. See id. at 1464. Specifically, the claimant had not complained of depression or sought treatment for depression between May 1988 and November 1991, when she finally saw a psychologist at the request of her attorney. See id.

/ / /

/ / /

21

1          Based on these cases, the court must agree with plaintiff that the ALJ's reliance on

2   her failure to seek treatment for depression and Dr. Cheung's lack of specialization in mental

3   health was misplaced.  However, the ALJ's ultimate conclusion that depression is not a severe

4   impairment because it does not "significantly limit the claimant's mental ability to perform basic

5   work activities" is supported by the record.  Specifically, plaintiff herself never mentioned

6   depression as a severe problem prior to the instant motion.  All of her complaints to date related

7   to physical pain stemming from the 2000 work injury.  As to Dr. Cheung – the only doctor to

8   even mention depression – the court has reviewed his report very carefully.  In his report of the

9   history of plaintiff's complaints, Dr. Cheung makes no mention whatsoever of depression or

10  mental problems.  The first indication of depression appears in a pain questionnaire completed by

11  plaintiff prior to her evaluation by Dr. Cheung.  According to Dr. Cheung, plaintiff reported that

12  she "feels depressed and tries to control her depression with exercise and reading the Bible."

13  With respect to clinical findings, Dr. Cheung's report documents absolutely no evidence of

14  depression.  His evaluation and diagnosis was based on a physical examination only.

15  Specifically, Dr. Cheung did not administer any psychological tests.  Despite objective findings

16  on mental status examination, and despite the absence of any neurological deficits, Dr. Cheung

17  nonetheless arrived at the wholly unsubstantiated diagnosis of "[c]hronic pain syndrome with

18  depression."

19          It is clear that Dr. Cheung's diagnosis was based entirely on plaintiff's subjective

20  complaints.  Therefore, this case is distinguishable from Sprague where there were objective

21  clinical observations of depression.  In any event, the court cannot say that the ALJ's conclusion

22  as to depression was incorrect.  There is no objective evidence of depression or depression-

23  related chronic pain syndrome based on neurologically based pain, let alone evidence that such

24  conditions affected plaintiff's ability to work at the residual functional capacity  assessed by the

25  ALJ.

26  / / /

2.     Obesity

In 1999, obesity was removed from the Listing of Impairments.  Obesity may still enter into a multiple impairment analysis, but "only by dint of its impact upon the claimant's musculoskeletal, respiratory, or cardiovascular system."  Celaya v. Halter, 332 F.3d 1177, 1181 n.1 (9th Cir. 2003).  Thus, as part of his duty to develop the record, the ALJ is required to consider obesity in a multiple impairment analysis, but only where it is "clear from the record that [the plaintiff's] obesity . . . could exacerbate her reported illnesses."  Id. at 1182; see also Burch v. Barnhart, 400 F.3d 676, 682 (9th Cir. 2005) (distinguishing Celaya and concluding that a multiple impairment analysis is not required where "the medical record is silent as to whether and how claimant's obesity might have exacerbated her condition" and "the claimant did not present any testimony or other evidence . . . that her obesity impaired her ability to work").  Where a multiple impairment analysis is not required, the ALJ properly considers obesity by acknowledging the plaintiff's weight in making determinations throughout the sequential analysis.  See Burch, 400 F.3d at 684.

Plaintiff argues:

In the case at bar, the ALJ failed to even mention Ms. Price's obesity, even though it was commented upon and discussed by treating and examining physicians.  In so doing, the ALJ failed to follow Social Security's own rules regarding the analysis of Ms. Price's obesity.

In particular, plaintiff refers to medical records from Drs. Arthur Anderson, Jeffrey Anderson, Miller, and Jordan.  As to the regulations, plaintiff stated:

In the instant case, the ALJ failed to evaluate Ms. Price's obesity impairment under SSR 02-01p as required by law.  The ALJ also failed to assess the impact her obesity might have on her ability to function in a sustained manner, standing alone and in combination with her musculoskeletal impairments.

/ / /

/ / /

/ / /

1          While plaintiff is correct that the ALJ did not conduct a multiple impairment

2   analysis with respect to plaintiff's weight, the court finds that there was no error.  As discussed

3   above, such an analysis is not required where there is no medical evidence that weight

4   exacerbated her condition.   See Celaya, 332 F.3d at 1182.  Turning to the medical records cited

5   by plaintiff, Dr. Arthur Anderson described plaintiff as "moderately obese" on March 22, 2002.

6   However, he did not suggest that her weight had any effect on her ability to do work-related

7   activities.  In April 2002, Dr. Arthur Anderson noted both that plaintiff's pain complaints persist

8   and that she lost 35 pounds.  However, Dr. Anderson does not, as plaintiff suggests, indicate any

9   link between weight and pain.  In April 2003, consultative examiner, Dr. Miller, noted plaintiff's

10  height and weight, but did not suggest any limitations as a result of obesity.  In fact, Dr. Miller

11  stated:  "Based on the physical examination, the patient has no objective evidence of limitation or

12  restriction of functional capacity."  In a July 27, 2004, letter, Dr. Jeffrey Anderson indicates that

13  plaintiff lost weight and recommended that she continue to do so.  As with Dr. Arthur Anderson,

14  Dr. Jeffrey Anderson does not suggest any link between weight and plaintiff's functional abilities

15  or opine that weight exacerbates any of her conditions.  Finally, in April 2005, Dr. Jordan

16  described plaintiff as obese and noted her height and weight.  Like all the other doctors, however,

17  she did not suggest any connection between plaintiff's weight and physical limitation.  Dr. Jordan

18  assessed plaintiff with the functional capacity for light work, which agrees with the ALJ's

19  determination.

20          In sum, no doctor who ever examined plaintiff suggested that her weight in any

21  way contributed to an assessed functional limitation.  While plaintiff is correct that some of the

22  doctors "mentioned" her weight, she is incorrect in stating that weight was "discussed" in the

23  context of its effect on her ability to work.  Because the ALJ was not required to conduct a

24  multiple impairment analysis concerning plaintiff's weight, the next question is whether the ALJ

25  properly considered plaintiff's obesity by noting it in his decision.  See Burch, 400 F.3d at 684.

26  A review of the ALJ's decision reflects that he did not mention plaintiff's weight at all.

1          Given plaintiff's height and fluctuating weight, it is not clear that she was obese

2    during all of the relevant time period.  In December 2002, plaintiff indicated on a disability adult

3    report that her height was 5'6" and her weight was 175 pounds.  Under Social Security Ruling 02-

4    01p, which adopts the National Institutes of Health definition of obesity as correlating to a body

5    mass index ("BMI") of 30 or above, this height and weight would yield a BMI of 28.2.[7]  Thus,

6    she was not considered obese in December 2002.  However, after that, it appears that plaintiff

7    gained weight.  In April 2003, plaintiff's weight was 216 pounds.  This yields a BMI of 35.1,

8    which would be considered obese.  In April 2005, plaintiff's weight was 207 pounds,

9    corresponding to a BMI of 33.5.  Strangely, in June 2005, plaintiff reported to Dr. Cheung that

10   she had lost 80 pounds in the last five years (i.e., since 2000).[8]  This report is entirely inconsistent

11   with the observations since 2002 that plaintiff gained weight.  Assuming for the moment that

12   plaintiff was in fact obese at all relevant times, the ALJ erred in not at least mentioning plaintiff's

13   weight in his decision.

14          Any error, however, must be considered harmless.  The Ninth Circuit has applied

15   harmless error analysis in social security cases in a number of contexts.  For example, in Stout v.

16   Commissioner of Social Security, 454 F.3d 1050 (9th Cir. 2006), the court stated that the ALJ's

17   failure to consider uncontradicted lay witness testimony could only be considered harmless ". . .

18   if no reasonable ALJ, when fully crediting the testimony, could have reached a different

19   disability determination."  Id. at 1056.  Similarly, in Batson v. Commissioner of Social Security,

20   359 F.3d 1190 (9th Cir. 2004), the court applied harmless error analysis to the ALJ's failure to

21   / / /

22   / / /

23

24          [7]     BMI is the ratio of weight in kilograms to the square of height in meters.  See
     S.S.R. 02-01p.

25

26          [8]     Unfortunately, Dr. Cheung did not record plaintiff's weight at the time of his
     evaluation.

1   properly credit the claimant's testimony.  Specifically, the court held:

2             However, in light of all the other reasons given by the ALJ for
       Batson's lack of credibility and his residual functional capacity, and in
3       light of the objective medical evidence on which the ALJ relied there was
       substantial evidence supporting the ALJ's decision.  Any error the ALJ
4       may have committed in assuming that Batson was sitting while watching
       television, to the extent that this bore on an assessment of ability to work,
5       was in our view harmless and does not negate the validity of the ALJ's
       ultimate conclusion that Batson's testimony was not credible.

6        Id. at 1197 (citing Curry v. Sullivan, 925 F.2d 1127, 1131 (9th Cir. 1990)).

7

8   In Curry, the Ninth Circuit applied the harmless error rule to the ALJ's error with respect to the

9   claimant's age and education.

10            In this case, the court finds that no ALJ would conclude that plaintiff's obesity

11  resulted in a severe impairment given the lack of any objective medical evidence suggesting that

12  plaintiff's weight in any way impacted her ability to perform work-related activities.  There

13  simply was no need to mention plaintiff's weight as it was of no consequence.  See Robbins v.

14  Social Security Administration, 466 F.3d 880, 885 (9th Cir. 2006) (citing Stout, 454 F.3d at

15  1055-56).[9]

16            3.    Right Wrist Sprain/Instability

17            Plaintiff cites to records from Dr. Carlblom regarding problems with her right

18  wrist.  The ALJ described plaintiff's right wrist problem in the context of describing her work

19  injury:  "The record documents that the claimant fell . . . and sustained a fracture to her right

20  wrist. . . ."  While he does not discuss Dr. Carlblom's treatment records, the ALJ discussed Dr.

21  Feinberg's assessment concerning plaintiff's right wrist.  Specifically, the ALJ stated that Dr.

22  Feinberg's findings "include a right grip strength decrement. . . ."  The ALJ also accepted Dr.

23  Feinberg's assessment that plaintiff experienced a "25% loss of pre-injury capacity for pushing,

24  —————————————

25       [9]     In fact, as with depression, plaintiff never mentions weight as a problem until the
    instant motion for summary judgment.  Specifically, she did not mention weight in her initial
    disability application, nor did her representatives mention it at either of her administrative
26  hearing or in post-hearing briefs submitted to the ALJ.

1  pulling, grasping, gripping, and manipulating with the right wrist."  The ALJ also noted:

2          In April 2001, practitioners assessed that the claimant's treatment program
       had been protracted and somewhat inappropriate due to clear clinical
3          objective findings that did not support the need for continued physical
       therapy beyond several months following the fall.
4

5  The ALJ, however, did not specifically discuss plaintiff's testimony concerning her inability to

6  lift with the right hand.  Nor did he include any particular limitations with respect to plaintiff's

7  wrist in his assessment of plaintiff's residual functional capacity.

8          The court finds that the ALJ did not err by not including right wrist limitations in

9  his residual functional capacity assessment.  As to records from Dr. Carlblom, while he noted

10  plaintiff's wrist complaints, he never specifically opined that she was functionally limited as a

11  result.  Moreover, plaintiff was discharged from therapy for her wrist pain within a few months

12  following the 2000 work injury.  Finally, while Dr. Feinberg did in fact conclude that plaintiff

13  suffered a decrease in right wrist capacity, he nonetheless opined that plaintiff could return to her

14  previous work and was only precluded from heavy work as a result of her wrist problem.  This

15  conclusion is consistent with the ALJ's determination that plaintiff could perform light work,

16  which does not involve heavy lifting.

17          The ALJ's conclusion is further supported by the functional capacity assessments

18  provided by Drs. Jordan and Miller.  In particular, Dr. Miller examined and tested plaintiff's

19  wrists.  In his April 2003 report, he noted that dorsiflexion, palmar flexion, radial flexion, and

20  ulnar flexion were all within normal limits on both the right and left.  He concluded that "[t]here

21  is no evidence of tenderness about either wrist."  In sum, plaintiff's loss of right wrist capacity

22  does not preclude light work.

23  / / /

24  / / /

25  / / /

26  / / /

27

1  **B.    Evaluation of Dr. Anderson's Opinion**

2          The weight given to medical opinions depends in part on whether they are

3  proffered by treating, examining, or non-examining professionals.  See Lester v. Chater, 81 F.3d

4  821, 830-31 (9th Cir. 1995).  Ordinarily, more weight is given to the opinion of a treating

5  professional, who has a greater opportunity to know and observe the patient as an individual,

6  than the opinion of a non-treating professional.  See id.; Smolen v. Chater, 80 F.3d 1273, 1285

7  (9th Cir. 1996); Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987).  The least weight is given

8  to the opinion of a non-examining professional.  See Pitzer v. Sullivan, 908 F.2d 502, 506 & n.4

9  (9th Cir. 1990).

10         In addition to considering its source, to evaluate whether the Commissioner

11  properly rejected a medical opinion the court considers whether:  (1) contradictory opinions are

12  in the record; and (2) clinical findings support the opinions.  The Commissioner may reject an

13  uncontradicted opinion of a treating or examining medical professional only for "clear and

14  convincing" reasons supported by substantial evidence in the record.  See Lester, 81 F.3d at 831.

15  While a treating professional's opinion generally is accorded superior weight, if it is contradicted

16  by an examining professional's opinion which is supported by different independent clinical

17  findings, the Commissioner may resolve the conflict.  See Andrews v. Shalala, 53 F.3d 1035,

18  1041 (9th Cir. 1995).  A contradicted opinion of a treating or examining professional may be

19  rejected only for "specific and legitimate" reasons supported by substantial evidence.  See Lester,

20  81 F.3d at 830.  This test is met if the Commissioner sets out a detailed and thorough summary of

21  the facts and conflicting clinical evidence, states her interpretation of the evidence, and makes a

22  finding.  See Magallanes v. Bowen, 881 F.2d 747, 751-55 (9th Cir. 1989).  Absent specific and

23  legitimate reasons, the Commissioner must defer to the opinion of a treating or examining

24  professional.  See Lester, 81 F.3d at 830-31.  The opinion of a non-examining professional,

25  without other evidence, is insufficient to reject the opinion of a treating or examining

26  professional.  See id. at 831.  In any event, the Commissioner need not give weight to any

1  conclusory opinion supported by minimal clinical findings.  See Meanel v. Apfel, 172 F.3d 1111,

2  1113 (9th Cir. 1999) (rejecting treating physician's conclusory, minimally supported opinion);

3  see also Magallanes, 881 F.2d at 751.

4        Plaintiff challenges the ALJ's assessment of the opinion of Dr. Jeffrey Anderson.

5  As to this doctor, the ALJ stated:

> Despite rather unremarkable radiological and objective findings, Jeffrey
> Anderson, M.D., treating physician, has consistently found the claimant. . .
> significantly limited by a back condition.  Dr. Anderson assessed an ability
> to lift/carry 5-10 pounds; stand/walk for 30 minutes at a time; and rarely
> bend.  He noted that the claimant was attempting to be retrained for a job
> that she could run out of her home while lying down as she has to lie down
> for an hour about every two hours out of every day or nearly half the day.[10]
> He contended that the claimant is unable to return to any sort of gainful
> employment in the open labor market (Ex. 7F, 10F, 13F & 17F).  The
> undersigned assigns minimal weight to Dr. Anderson's opinion which is
> based on the subjective complaints expressed by the claimant in only
> intermittent meetings over a period of several years and does not take into
> account objective, clinical and imaging evidence of record which is at
> variance with such a restrictive capacity level.

14  Plaintiff argues:

> . . . [T]he ALJ rejected the opinions of the treating physician
> regarding Ms. Price's significant work related limitations without a
> legitimate basis and in contravention of the law regarding the hierarchy of
> physician evidence.

18        Because Dr. Anderson's opinion is contradicted, the ALJ may reject it only for

19  "specific and legitimate" reasons.  See Lester, 81 F.3d at 830.  Based on the ALJ's discussion, it

20  is clear that he rejected Dr. Anderson's opinion because:  (1) it is not based on the doctor's

21  objective observations but, rather, on plaintiff's subjective complaints; and (2) it is not consistent

22  with the other evidence of record, which indicates a less restrictive functional capacity.  The

23  court finds that these are specific and legitimate reasons for rejecting Dr. Anderson's opinion.

----

[10]    The court notes that plaintiff has stated that she is thinking about starting an in-home child care business, which would seem to preclude her from lying down frequently and would involve much more physical capacity than plaintiff says she has.

1    See Meanel, 172 F.3d at 1113; see also Magallanes, 881 F.2d at 751.   Thus, the ALJ applied the

2    correct legal standard in assessing Dr. Anderson's opinion.

3                    The question, then, is whether the ALJ's reasons are supported by the record as a

4    whole.   The court concludes they are.   First, it is abundantly clear that Dr. Anderson's opinion is

5    supported by, at best, minimal objective evidence.   Plaintiff was seen by Dr. Anderson between

6    July 2003 and October 2005.   During this over two-year period, plaintiff was seen by Dr.

7    Anderson perhaps eight or nine times.   In Dr. Anderson's notes of every visit, he indicated that

8    plaintiff was intact neurologically.   On October 1, 2003, July 27, 2004, November 12, 2004, and

9    March 30, 2005, he indicated that straight leg raising was negative.   MRI scans reviewed by Dr.

10   Anderson showed only mild degenerative changes.   The only possible support for the doctor's

11   conclusion that plaintiff was as limited as he opined consists of plaintiff's subjective complaints

12   of pain and tenderness.

13                    Second, Dr. Anderson's assessment is entirely at odds with those of Drs. Miller

14   and Jordan, both of whom performed comprehensive examinations and reported objective

15   findings.   On April 15, 2003, Dr. Miller prepared a report following his comprehensive

16   examination of plaintiff.   As discussed above, Dr. Miller's clinical observations were all within

17   normal limits.   He concluded:   "Based on the physical examination, the patient has no objective

18   evidence of limitation or restriction of functional capacity."   Dr. Jordan also conducted a

19   comprehensive examination of plaintiff and prepared a report on April 26, 2005.   Dr. Jordan

20   found no limitations inconsistent with light work.

21                    Third, Dr. Anderson's conclusions are inconsistent from visit to visit, even with

22   the same "objective" findings.   For example, in August 2003, Dr. Anderson noted subjective

23   complaints of  "pain in low back aggravated by sitting, standing, walking, bending, and lifting."

24   Objectively, Dr. Anderson observed that plaintiff was neurologically intact.   He concluded that

25   plaintiff should remain off work permanently.   However, in October 2003, Dr. Anderson noted

26   that plaintiff's complaints were unchanged and, again, she was neurologically intact.   But he

1  concluded that she could return to modified work with "[n]o lifting over 15 lbs., no repetitive

2  bending, and she should be able to alternate between sitting and standing every twenty minutes."

3  The following is a summary of Dr. Anderson's varying conclusions over time based on

4  essentially the same observations:

5  |  | August 2003 | Permanently disabled |

6  | | October 2003 | Can return to work when re-trained |

7  | | July 2004 | Permanently disabled |

8  | | November 2004 | Permanently disabled |

9  | | March 2005 | Can return to work when re-trained |

10 | | July 2004 | Can perform limited work functions |

11 | | October 2005 | Permanently disabled |

12 | | April 2006 | Can perform limited work functions |

13 Even though plaintiff's complaints remained the same throughout much of Dr. Anderson's

14 treatment of plaintiff, and even though he consistently reported that she was neurologically intact,

15 Dr. Anderson's ultimate conclusions varied widely between permanently disabled and able to

16 return to work with re-training.  It is not logical that the same subjective and objective findings

17 would yield such drastically different conclusions over time.

18         For these reasons, the court finds that the ALJ properly rejected the unsupported,

19 inconsistent, and contradicted opinion of Dr. Jeffrey Anderson.

20     **C.    Plaintiff's Credibility**

21         The Commissioner determines whether a disability applicant is credible, and the

22 court defers to the Commissioner's discretion if the Commissioner used the proper process and

23 provided proper reasons.  See Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1995).  An explicit

24 credibility finding must be supported by specific, cogent reasons.  See Rashad v. Sullivan, 903

25 F.2d 1229, 1231 (9th Cir. 1990).  General findings are insufficient.  See Lester v. Chater, 81 F.3d

26 821, 834 (9th Cir. 1995).  Rather, the Commissioner must identify what testimony is not credible

and what evidence undermines the testimony.  See id.  Moreover, unless there is affirmative

evidence in the record of malingering, the Commissioner's reasons for rejecting testimony as not

credible must be "clear and convincing."  See id.

        If there is objective medical evidence of an underlying impairment, the

Commissioner may not discredit a claimant's testimony as to the severity of symptoms merely

because they are unsupported by objective medical evidence.  See Bunnell v. Sullivan, 947 F.2d

341, 347-48 (9th Cir. 1991) (en banc).  The Commissioner may, however, consider the nature of

the symptoms alleged, including aggravating factors, medication, treatment, and functional

restrictions.  See id. at 345-47.  In weighing credibility, the Commissioner may also consider: (1)

the claimant's reputation for truthfulness, prior inconsistent statements, or other inconsistent

testimony; (2) unexplained or inadequately explained failure to seek treatment or to follow a

prescribed course of treatment; (3) the claimant's daily activities; (4) work records; and (5)

physician and third-party testimony about the nature, severity, and effect of symptoms.  See

Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996) (citations omitted).

        Plaintiff argues:

        The medical evidence documenting Ms. Price's impairments was
        fully corroborative of the symptoms and limitations to which she testified,
        including severe chronic pain, manipulative limitations, numbness in her
        legs, pain and numbness in her right hand, extreme difficulty holding as
        much as 1/2 gallon of milk in her right hand, and difficult walking more
        than 10 to 15 minutes at a time, on a good day.

As to plaintiff's credibility, the ALJ stated:

        In evaluating the claimant's subjective complaints and alleged limitations,
        it is noted that she is partially credible, but the record does not fully
        support her allegations.

        The record notes that the claimant alleged debilitating impairment from
        spinal problems which causes chronic pain and continuing difficulties
        following a fall in 2000.  It is documented that she did indeed experience a
        fall while on the job in 2000 in which she fractured her right wrist and
        bruised her right hip.  However, over time and through the benefits of
        physical therapy, the claimant had made a good recovery.  In April 2001,
        practitioners assessed that the claimant's treatment program had been

protracted and somewhat inappropriate due to clear clinical objective findings that did not support the need for continued physical therapy beyond several months following the fall.  Diagnostic testing identified degenerative disc disease, but it is rather mild and has been stable for years.  Spinal surgery, although discussed, has not been recommended.  In her testimony, the claimant reported a variety of ways she fills up her time, in that she does the laundry every three days; cooks three times a week; has a garden; plants seeds; does pruning; likes to sew and read; walks a block daily for 15 minutes; shops monthly; and does  water therapy and swims.  The Administrative Law Judge finds that the claimant's allegations are not fully credible and do not restrict her ability to perform work-related activities.

The ALJ did not specifically discuss the credibility of plaintiff's testimony concerning her ability to lift objects with her right hand.

In making his credibility determination, the ALJ noted the extensive medical record and particularly the findings of Drs. Feinberg, Miller, and Jordan.  The ALJ noted Dr. Feinberg's finding that, while plaintiff had a decrease of 25% pre-injury capacity in her right wrist, plaintiff was nonetheless capable of activities consistent with at least light work.  Similarly, the ALJ noted the findings of Drs. Miller and Jordan, discussed above.  Based on the record as a whole, the court cannot accept plaintiff's statement that the medical evidence is "corroborative of the symptoms and limitations to which she testified."  To the contrary, the objective evidence does not support the limitations reflected by her testimony.  Because the ALJ noted the objective findings which contradict plaintiff's testimony, the court finds that he provided the required "clear and convincing" reasons to reject her testimony as not fully credible and that the ALJ's reasons are supported by the record.

### D.   **Hypothetical Questions**

Hypothetical questions posed to a vocational expert must set out all the substantial, supported limitations and restrictions of the particular claimant.  See Magallanes v. Bowen, 881 F.2d 747, 756 (9th Cir. 1989).  If a hypothetical does not reflect all the claimant's limitations, the expert's testimony as to jobs in the national economy the claimant can perform has no evidentiary value.  See DeLorme v. Sullivan, 924 F.2d 841, 850 (9th Cir. 1991).  While

the ALJ may pose to the expert a range of hypothetical questions, based on alternate interpretations of the evidence, the hypothetical that ultimately serves as the basis for the ALJ's determination must be supported by substantial evidence in the record as a whole.  See Embrey v. Bowen, 849 F.2d 418, 422-23 (9th Cir. 1988).

The record reflects that the ALJ posed two hypothetical questions to the vocational expert – one based on his finding that plaintiff had the residual functional capacity for light work, and one based on Dr. Jeffrey Anderson's assessed limitations.  Plaintiff argues that, because the ALJ improperly rejected Dr. Anderson's opinion, only the second hypothetical would be valid.  As discussed above, the court does not agree with plaintiff's premise that the ALJ improperly rejected Dr. Anderson's opinion.  Nor did the ALJ err with respect to plaintiff's alleged depression and chronic pain syndrome or her right wrist impairment, neither of which are severe or erode plaintiff's capacity for light work.  The record supports the first hypothetical based on the capacity for light work.

## V.  CONCLUSION

Based on the foregoing, the court concludes that the Commissioner's final decision is based on substantial evidence and proper legal analysis.  Accordingly, IT IS HEREBY ORDERED that:

      1.     Plaintiff's motion for summary judgment is denied;

      2.     Defendant's cross-motion for summary judgment is granted; and

      3.     The Clerk of the Court is directed to enter judgment and close this file.

DATED:  February 26, 2008

**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE